JULIUS AUSCH, as Assignee of ABBEY RESIDENTIAL HOME, INC., et al., Respondents, v ST. PAUL FIRE & MARINE INSURANCE COMPANY, Appellant.

Second Department, February 17, 1987

APPEARANCES OF COUNSEL

*Tell, Cheser & Breitbart (Benjamin L. Tell, Solomon M. Cheser* and *Kenneth R. Feit* of counsel), for appellant.

*Weg & Myers, P. C. (Frank A. Weg* and *Ira M. Myers* of counsel), for respondents.

## OPINION OF THE COURT

Per Curiam.

The plaintiff Julius Ausch, as the assignee of Abbey Residential Home, Inc. (hereinafter Abbey), the named insured, and Abbey commenced the instant action to recover for fire losses on an insurance policy issued by the defendant covering premises located at 86 Van Ness Place, Newark, New Jersey. Two incendiary fires occurred on the premises during the month of December 1981 approximately two months after the insurance coverage was increased from $150,000 to $380,000 and approximately six months after the shelter-care home being operated by Abbey on the premises was closed by the New Jersey Department of Health. After the shelter-care home was closed, the premises were operated as a rooming house.

The defendant challenges the dismissal, after a Bench trial, of its second and third affirmative defenses for failure of proof. The second affirmative defense alleged that the plaintiff Abbey breached the standard fire insurance policy provision requiring disclosure by way of submission to examinations under oath, as often as may be reasonably required, in that Abbey

failed to produce for examination the corporate officer and shareholder Naftali Ausch, the accountant Twerski, and its books and records. The third affirmative defense alleged that the plaintiff Julius Ausch, a corporate officer, concealed, misrepresented and swore falsely as to material matters at his examination under oath. It was alleged, in particular, that Julius falsely swore that he owned Abbey and that his brother, Naftali Ausch, did not have an interest in Abbey at the time of the fires. Although its arson expert had opined that the subject fires were incendiary in origin, the defendant consented to strike its arson defense due to its inability to show the fires were set with the knowledge and consent of the insured.

On appeal, the defendant contends for the first time that the Trial Judge applied an erroneous standard of proof. In issuing his decision from the Bench, the Trial Judge stated that the defendant had the burden of proof with respect to the second and third affirmative defenses and that *both* defenses had to be established by clear and convincing evidence. The latter is a higher, more demanding standard than the preponderance of the evidence standard *(Rossi v Hartford Fire Ins. Co.,* 103 AD2d 771; *Simcuski v Saeli,* 44 NY2d 442, 452). "A party who must prove his case by a preponderance of the evidence only need satisfy you that the evidence supporting his case more nearly represents what actually happened than the evidence which is opposed to it. But a party who must establish his case by clear and convincing evidence must satisfy you that the evidence makes it highly probable that what he claims is what actually happened" (PJI 1:64 [1986 Supp]). Although no objection to the application of this standard of proof appears in the record, the Trial Judge's ruling in this regard constituted error warranting the exercise of our discretionary powers of review in the interest of justice.

The defendant clearly has the burden of proof regarding both affirmative defenses. While the clear and convincing evidence standard of proof applicable to fraud cases has been held applicable to defenses of arson and false swearing *(Hutt v Lumbermens Mut. Cas. Co.,* 95 AD2d 255; *Rossi v Hartford Fire Ins. Co., supra; see, Simcuski v Saeli, supra; Saks & Co. v Continental Ins. Co.,* 26 AD2d 540, *affd* 23 NY2d 161), this standard has not been expressly applied to the affirmative defense of refusal to comply with policy requirements (PJI 4:80 [1986 Supp]). The defendant's burden of proving lack of cooperation on the part of its insured has been described as a

"heavy" one *(see, Dyno-Bite, Inc. v Travelers Cos.,* 80 AD2d 471, 475, *appeal dismissed* 54 NY2d 1027), especially in cases where an innocent accident victim would be deprived of his source of payment because a liability carrier claims that its assured has failed to cooperate *(see, Thrasher v United States Liab. Ins. Co.,* 19 NY2d 159, 168; *Van Opdorp v Merchants Mut. Ins. Co.,* 55 AD2d 810). Notwithstanding this characterization, we hold that the standard of proof applicable for establishing a breach of the policy's cooperation clause in a case involving an indemnity carrier seeking to avoid payment to a fire insured, which is a party in control of its own fate *(see, Dyno-Bite, Inc. v Travelers Cos., supra,* at pp 475-476), is a preponderance of the evidence. Accordingly, the trial court erred in applying the clear and convincing evidence standard with respect to the second affirmative defense, but not with respect to the third affirmative defense.

A factual issue material to the defendant's second affirmative defense that the insured had breached its duty to assist in an investigation regarding a possible arson was whether or not Naftali Ausch had an interest in Abbey sufficient to require his appearance at an examination under oath. Upon reviewing the record, we conclude that the trial court's finding that Naftali was neither a principal nor officer of the insured, a close corporation, is against the weight of the credible evidence. Since this was a Bench trial, we have exercised our power to make new findings of fact and to render a judgment warranted by our findings "taking into account in a close case 'the fact that the trial judge had the advantage of seeing the witnesses' " *(Northern Westchester Professional Park Assoc. v Town of Bedford,* 60 NY2d 492, 499; *Cohen v Hallmark Cards,* 45 NY2d 493, 498).

The testimony and documentary evidence adduced at trial establish the fact that Naftali Ausch purchased all the stock of Abbey from Paula and Lewis Gash in 1977. Julius Ausch, Naftali's brother, managed the corporation after the purchase. At the time of the trial, the stock certificate, dated February 28, 1977, was still in Naftali's name. This certificate further indicates that Naftali was president of the insured. The license to operate the shelter-care home, prior to its revocation in June 1981, was in Naftali's name. Julius conceded that the two years of hearings on violations that resulted in the revocation of the license, involved both he and Naftali. The Community National Bank's signature card for Abbey's checking account discloses that the only person authorized to sign

checks drawn on the corporation's account was Naftali Ausch, albeit bank statements were to be sent to Abbey, in care of Julius, at the latter's home address. Naftali remained obligated on notes he signed as part of the purchase price of the Abbey stock and his name appears on pleadings and documents settling an action in New Jersey commenced in 1981 by the Gashs, as the plaintiffs, against, *inter alia,* Naftali and Abbey, as the defendants, to foreclose the mortgage securing the aforementioned notes. One settlement agreement, dated January 10, 1984, contains the self-serving statement that the agreement was made "without any admission that at any time concerning ABBEY, NAFTALI was actually an interested person or party". A check, dated August 1, 1982, and drawn on Abbey's account, payable to the mortgagee Paula Gash was signed in the name of Naftali Ausch. Naftali's name also appears on three "Request for Wage and Separation Information" forms certifying the amount of Abbey's former employees' salary which were filed with the New Jersey Department of Labor and Industry, Division of Unemployment and Disability Insurance, after the shelter-care facility was closed. Naftali, an insurance broker, also procured for Abbey a $1,000,000 insurance policy from Lloyd's of London after the defendant canceled the instant policy.

In rebuttal to this evidence showing that Naftali was a principal and officer of the insured at the time of the fire, Julius Ausch testified that he purchased Abbey from Naftali in September 1980 and continued to sign Naftali's name to corporate checks and documents. According to Julius, he purchased the stock in September 1980 from Naftali for $10,000, although approximately three years prior to this transfer, Naftali purchased the stock for at least $120,000, payable $40,000 in cash, and $80,000 in notes. Julius did not have a canceled check or receipt evidencing the $10,000 payment, nor did he recall the name of the friend who gave him the money to pay Naftali. Julius stated that as part of the purchase price, he also gave Naftali a 25% interest in Brucha Realty Corporation, which owned Julius' three-family home. At the trial, he conceded that all the stock in Brucha was in his wife Esther's name and claimed that after the shelter-care home was closed and the license revoked, Naftali gave him back the 25% interest in Brucha. We also note that Naftali continued to remain obligated on the notes he signed to initially purchase the Abbey stock from the Gashs, to the tune of at least $59,737 in late 1981 as no assumption of

liability on the notes nor a release was executed by the relevant parties. He further testified that no legal documents whatsoever evidencing the transfers of stock in either corporation were ever drafted or executed by the parties. Julius testified that his father, a rabbi, drew up a Yiddish agreement between Naftali and him as evidence of the sale. This document was never produced at the trial nor was it ever produced at Julius' examinations under oath or at Naftali's examination before trial, despite the defendant's request for its production. An unfavorable inference may be drawn when, as in this case, a party fails to produce evidence which is within his control and which he is naturally expected to produce *(Orange & Rockland Utils. v Hess Corp.,* 59 AD2d 110, 119; 2 Wigmore, Evidence § 285 [Chadbourn rev 1979]; Richardson, Evidence § 92 [Prince 10th ed]; 21 NY Jur, Evidence, § 124). Moreover, relatives are generally considered under the control of a party *(see, Rosa v Blander,* 47 AD2d 865; *Group v Szenher,* 260 App Div 308, *affd* 284 NY 741; Fisch, New York Evidence § 1126 [2d ed]; *see also, Relationship Between Party and Witness as Giving Rise to or Affecting Presumption or Inference from Failure to Produce or Examine Witness,* Ann., 5 ALR2d 893, § 19). Although Naftali would have personal knowledge of the alleged transaction, Julius did not request his brother to testify at the trial as his witness. Nor did Naftali respond to a judicial subpoena duces tecum served by the defendant.

The defendant submitted Naftali's deposition into evidence. At his deposition on September 6, 1983, Naftali disclaimed any interest in Abbey and also testified that he sold the business to Julius, but he could not recall the terms of the sale or when the sale took place. Naftali refused to answer questions regarding whether he took a tax deduction with respect to Abbey within the last three years; whether he received any of the proceeds from the settlement of an insurance claim on a policy issued by Lloyd's of London regarding a subsequent fire on the premises; whether his signature appeared on a check dated August 1, 1982, issued on Abbey's account; whether his signature appeared on the New Jersey unemployment forms; whether he signed any checks, corporate tax forms, or corporate documents after the alleged sale to Julius, whether Julius still owed him money from the sale; whether he got back the money he originally invested in Abbey; whether he appeared or had an attorney represent him at the two years of hearings conducted in New Jersey which terminated on June 5, 1981, with an order closing the

shelter-care facility; who in fact owned the stock in Abbey; and whether he agreed to a consent order dated October 8, 1981, settling the foreclosure action brought by the Gashs on the notes and mortgage signed by Naftali.

Credibility is best determined by the trier of fact who has the advantage of observing the witnesses and, necessarily, is in a superior position to judge veracity than an appellate court, which reviews but the printed record *(People v Stroman,* 83 AD2d 370, 372; Fisch, New York Evidence § 446 [2d ed]). Here, the evidence used to impeach the testimony of Julius Ausch caused the trial court to be very suspicious and not to give credence to all the testimony of Julius with respect to Naftali. In evaluating testimony, we should not discard common sense and common knowledge. The rule is that " ' "testimony which is incredible and unbelievable, that is, impossible of belief because it is manifestly untrue, physically impossible, contrary to experience, or self-contradictory, is to be disregarded as being without evidentiary value, even though it is not contradicted by other testimony or evidence introduced in the case" ' " *(People v Stroman, supra,* at p 373; *People v Shedrick,* 104 AD2d 263, 274, *affd* 66 NY2d 1015; 22 NY Jur, Evidence, § 649). While the testimony of the attorney representing Paula and Lewis Gash in the foreclosure action pending in New Jersey is some evidence that Julius impersonated Naftali and signed Naftali's name to documents regarding Abbey's business dealings, we reject, as incredible as a matter of law, Julius' testimony regarding Naftali's transfer of his *entire* interest in Abbey to him, under the inherently improbable conditions and circumstances described by him.

The trial court also found Julius' testimony regarding the nonproduction of Abbey's books and records suspicious. Julius never complied with the defendant's repeated requests to produce the stock certificate, the corporate stock book, Julius' personal Federal tax returns for the years he managed and purportedly owned Abbey (aside from a 1978 return), Abbey's financial statements (aside from two statements dated May 7 and 14, 1979), Abbey's tax returns (aside from a 1977 tax return and three Internal Revenue Service notices issued in April, May and June 1981) and Abbey's canceled checks and monthly bank statements for periods prior to and after the fire. At one of his examinations under oath, Julius stated that he had asked the independent accountant, Mr. Twerski, for copies and worksheets of tax returns and financial statements Twerski prepared for Abbey and was informed by Twerski

that everything in Twerski's files had been turned over to Julius before the first fire. Julius surmised that said records were burned in the fires, and additionally stated that no corporate tax returns had been filed for the last couple of years. He also testified that he filed no personal tax returns for 1980, 1981, 1982 and 1983, albeit he was also employed as a diamond broker. Regarding Abbey's canceled checks and bank statements, Julius stated he threw them in the garbage. However, at trial, Julius produced bank statements for May 29, 1981 to December 30, 1981, canceled checks and other corporate records which he allegedly discovered in a briefcase in his basement while moving to a new residence. While Julius surmised at his examination under oath that the stock book and certificate had also been burned in the fires, it is noteworthy that the Gashs' attorney testified that he held all of Abbey's outstanding stock in escrow, as further collateral on the notes Naftali used to purchase the stock.

Based on this record, we find, not only by a preponderance of the evidence but also by clear and convincing evidence, that Naftali Ausch was a principal and officer of the corporate insured. Naftali Ausch's interest in this close corporation was sufficient to require his appearance at an examination under oath. His willful refusal to comply with several requests to appear at an examination under oath, a condition precedent to the defendant's performance of the promise to indemnify *(see, Bulzomi v New York Cent. Mut. Fire Ins. Co.,* 92 AD2d 878), constitutes a material breach of the cooperation clause and a defense to an action on the policy *(see, Dyno-Bite, Inc. v Travelers Cos.,* 80 AD2d 471, 475, *supra; Pogo Holding Corp. v New York Prop. Ins. Underwriting Assn.,* 73 AD2d 605). Moreover, the plaintiffs have not satisfactorily explained Abbey's failure to supply the defendant with material and relevant documentation relating to its financial status at the time of the fire, in further breach of the cooperation clause *(Averbuch v Home Ins. Co.,* 114 AD2d 827). This is not a case where the insured's attempt to comply has fallen short through some " 'technical and unimportant omissions or defects' ", to warrant a finding that it "substantially performed its obligation to co-operate" *(Lentini Bros. Moving & Stor. Co. v New York Prop. Ins. Underwriting Assn.,* 53 NY2d 835, 836; *cf. Porter v Traders' Ins. Co.,* 164 NY 504, 509). Rather the record is indicative of a pattern of noncooperation and avowed obstruction.

▮ The appeal from the order and interlocutory judgment

must be dismissed because the right of direct appeal therefrom terminated with the entry of final judgment in the action *(see, Matter of Aho,* 39 NY2d 241, 248). The issues raised on appeal from the order and interlocutory judgment are brought up for review and have been considered on the appeal from the final judgment (CPLR 5501 [a] [1]).

■ Accordingly, judgment should be granted to the defendant on its second affirmative defense and the complaint should be dismissed. In view of this disposition, we have not addressed the issue of whether or not the third affirmative defense was established by clear and convincing evidence.

BRACKEN, J. P., NIEHOFF, RUBIN and LAWRENCE, JJ., concur.

Ordered that the appeal from the order and interlocutory judgment is dismissed; and it is further,

Ordered that the judgment is reversed, on the law and the facts, the order and interlocutory judgment dated April 2, 1984 is vacated, that branch of the plaintiffs' motion which was to dismiss the defendant's second affirmative defense is denied, that branch of the motion which was to dismiss the third affirmative defense is dismissed as academic, the second affirmative defense is sustained, and the complaint is dismissed; and it is further,

Ordered that the defendant is awarded one bill of costs.